32 A.3d 128

## The CARROLL INDEPENDENT FUEL COMPANY

### v.

## WASHINGTON REAL ESTATE INVESTMENT TRUST.

No. 467, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 1, 2011.

208

Alphonse M. Alfano (John M. Luchak, Bassman, Mitchell & Alfano, Chrtd., on the brief), Washington, DC, for Appellant.

Gerald W. Heller (Linda M. Schuett, Linowes & Blocher, LLP, on the brief), Bethesda, MD, for Appellee.

Panel: GRAEFF, KEHOE, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

GRAEFF, J.

This case arises from two lease agreements, in which Washington Real Estate Investment Trust ("WRIT"), appellee/cross-appellant, leased two service stations located in the Westminster Shopping Center to the Carroll Independent Fuel Company, appellant/cross-appellee ("CIF"). After the leases were terminated, a dispute arose regarding: (1) the responsibility for cleaning up contamination found in the soil and groundwater surrounding the service station buildings; and (2) whether CIF failed to surrender possession of the premises, requiring it to pay a holdover fee in the amount of three times the annual rent. WRIT filed suit in the Circuit Court for Carroll County, and after an eight-day trial, the court found that CIF was not liable for the environmental contamination, but CIF was a holdover tenant required to pay $624,621.09, plus attorneys' fees in the amount of $25,000.

On appeal and cross-appeal, the parties present several questions for our review,[1] which we have consolidated and reworded as follows:

1. CIF presents the following questions for review:
 1. Whether a tenant's failure upon termination of a lease to remove fuel tanks from an area adjacent to the leased premises constitutes "holding over" under the lease, where the lease vests ownership of the tanks in the landlord, and where the lease contains no provision requiring the tenant to remove the tanks.
 2. Whether a tenant's failure upon surrendering possession of leased premises to provide the landlord with an inspection certificate of the buildings formerly occupied by the tenant, which certificate is due ten days after surrender, constitutes a "holding over" under the lease, where such failure did not deprive the landlord of possession of the leased premises or cause the landlord to suffer any damages.
 3. Whether a tenant's failure to remove a trespasser from the leased premises after termination of the lease constitutes "holding over" by the tenant, where the tenant's obligation under the lease to remove trespassers did not survive lease termination and where the tenant otherwise lacked a leasehold or other interest in the leased premises sufficient to evict the trespasser.

1. Did the trial court err in finding that CIF was a holdover tenant because it failed to (a) remove gas tanks, (b) deliver an environmental inspection certificate, and (c) remove a third-party from its property?

2. Was the imposition of holdover fees an unenforceable penalty?

---

4. Whether the court's imposition of holdover fees in the amount of $624,000, in the absence of actual damages, constitutes an unenforceable "penalty" under Maryland law, when the leases authorize the imposition of the fee as a component of compensation "in addition to" actual or consequential damages and not as a reasonable forecast of damages in the event of a breach.

WRIT, as a cross-appellant, presents the following questions for our review:

1. Whether the Circuit Court correctly concluded that Carroll was a holdover tenant required to pay holdover rent as stated in its leases when (i) Carroll failed to remove underground storage tanks registered to it under Maryland law for months after Carroll claims to have terminated the leases; (ii) the leases prohibited Carroll from permitting any other persons from occupying the property without the express written consent of WRIT, no such consent was given, and an entity other than Carroll occupied and operated from the property for years before and months after Carroll claims to have terminated the leases; (iii) surrender of the property was required to be "in accordance with the provisions" of the leases and Carroll failed to provide to WRIT an environmental certificate required under the leases; and, (iv) Carroll continued to pay base rent and repeatedly returned to the property to perform invasive environmental testing and conduct other activities after the time it claims to have terminated the leases.

2. Whether the Circuit Court erred in refusing WRIT's request for prejudgment interest when (i) the Court concluded that holdover rent was owed by Carroll to WRIT under the leases on specific dates identified by the Court; and, (ii) under well-established Maryland law, pre-judgment interest is recoverable as a matter of right under contracts in writing to pay money on a date certain, such as rent.

3. Whether the Circuit Court erred in awarding WRIT the sum of $25,000.00 in attorneys' fees and expenses when (i) the leases require Carroll to indemnify WRIT for its attorneys' fees and expenses; (ii) the judgment obtained by WRIT against Carroll totaled $624,621.09, but the Court awarded WRIT an amount less than five percent (5%) of that judgment and substantially less than the attorneys' fees and expenses actually incurred by WRIT; and, (iii) the Court's Memorandum Opinion does not establish

3. Did the circuit court err in failing to award prejudgment interest to WRIT?

4. Did the circuit court err in awarding WRIT $25,000 in attorneys' fees, an amount substantially less than requested?

For the reasons set forth below, we shall reverse the judgment of the circuit court finding that CIF was a holdover tenant, but affirm the order awarding attorneys' fees.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 1988, CIF, a wholesale distributor of motor fuels that sells to retail service station operators, entered into a ten-year commercial lease agreement with WRIT to lease a gasoline service station in Westminster, Maryland. Approximately one year later, on September 8, 1989, CIF and WRIT entered into another ten-year commercial lease agreement for another adjacent gasoline service station.[2]

### The Leases

The parties agree that the leases are virtually identical. The leases conveyed a leasehold interest in the "Demised Premises," which are defined as:

the former "Shell" service station fronting at the intersection of Rt. 140 and Englar Rd., located in Westminster, County of Carroll, State of Maryland, and shown outlined in red on the plot plan attached hereto ..., being a store containing approximately 2464 square feet of gross leasable

that the Circuit Court fully examined the record in order to properly exercise its discretion in connection with the award of WRIT's fees and costs.

2. The service stations were two back-to-back buildings, designated as Units # 30 and # 31. The surrounding land housed the tanks, pipes, pumps, canopies, and equipment related to operation of the service stations. According to the Maryland Department of the Environment, both sites were "heavily contaminated" with petroleum before CIF occupied them.

area ..., and being part of the Westminster Shopping Center....

and

the former "Texaco" service station fronting at the intersection of Rt. 140 & Englar Road, located in Westminster, County of Carroll, State of Maryland, and shown outlined in red on the plot plan attached ..., being a store containing approximately 1670 square feet of gross leasable area ..., and being part of the Westminster Shopping Center....

An addendum to the lease required CIF to install new gasoline tanks at each of the leased properties. Specifically, it provided:

at [CIF]'s sole cost and expense and without any cost or expense to [WRIT], install three new gasoline tanks ... within the boundaries shown on the attached plan.... [WRIT] shall not be responsible for any such construction costs whatsoever, including the cost of bringing utilities to and hooking the same up with the "Additions."...

\* \* \*

Said "Additions (including all existing or new) shall, at the end of the term (or options period) belong to [WRIT] ( [including] equipment, improvements, gasoline tanks, islands, canopies, etc.).[3]

The leases permitted CIF to sublet or assign the premises with "the prior written consent of" WRIT, stating:

[Except for subletting a retail gasoline dealer franchise,] [CIF] shall not assign this Lease, in whole or in part, nor sublease all or any part of the Demised Premises nor permit other persons to occupy the Demised Premises or any part thereof, nor grant any license or concession for all or any part of the Demised Premises, without the prior written consent of [WRIT]. In the event [CIF] desires to sublet a portion of the Demised Premises, [CIF] shall give to

---

3. WRIT wanted to own the tanks because it wanted "turn-key usable gas station[s] to be able to sublet" after termination of its lease with CIF.

[WRIT] thirty (30) days' written notice of [CIF]'s intention to do so.... If this Lease be assigned or if the Demised Premises or any part thereof be sublet without the express written consent of [WRIT] first being obtained, [WRIT] may collect rent from the assignee, subtenant or occupant and apply the net amount collected to all rent herein reserved, but no assignment, underletting, occupancy or collection shall be deemed a waiver of this provision or the acceptance of the assignee, subtenant or occupant as Lessee, or a release of Lessee from the further performance by [CIF] of the covenants on its part to be observed or performed hereunder.

The leases also addressed CIF"s obligation at its termination of the lease. The original leases provided as follows:

36. SURRENDER OF PREMISES

Upon the expiration or sooner termination of this Lease, [CIF] agrees to quit and surrender the Demised Premises, broomclean, in good condition and repair, reasonable wear and tear and casualty excepted, together with all keys and combinations to locks, safes and vaults and all improvements, alterations, additions, fixtures and equipment at any time made or installed in, upon or to the interior or exterior of the Demised Premises, except personal property and other unattached movable trade fixtures put in at [CIF]'s expense, all of which shall thereupon become the property of [WRIT] without any claim by [CIF] therefore, but the surrender of such property to [WRIT] shall not be deemed to be a payment of rent or in lieu of any rent reserved hereunder. Before surrendering the Demised Premises, [CIF] shall remove all of [CIF]'s said personal property and unattached movable trade fixtures. If [CIF] shall fail to remove any of [CIF]'s said personal property and trade fixtures, either said property shall, at the option of [WRIT], be deemed abandoned and become the exclusive property of [WRIT] or [WRIT] shall have the right to remove and store said property, at the expense of [CIF], without further notice to or demand upon [CIF], and hold [CIF] responsible for any and all charges and expenses incurred by [WRIT]

therefore. If the Demised Premises be not surrendered as and when aforesaid, [CIF] shall indemnify [WRIT] against all loss or liability resulting from the delay by [CIF] in so surrendering the same, including without limitation any claims made by a succeeding occupant founded on such delay. [CIF]'s obligations under this Section shall survive the expiration or sooner termination of the term of this Lease.

37. HOLDING OVER

Should Lessee remain in possession of the Demised Premises after the expiration of the term of this Lease (or any renewal term hereof) with or without the consent of Lessor, express or implied, such holding over shall, in the absence of a written agreement to the contrary, be deemed to have created and be construed to be a tenancy from month to month, terminable on thirty (30) days written notice by either party to the other, at twice the rentals (prorated on a monthly basis) in effect during the rental year immediately preceding the expiration of the term of this Lease (or any renewal term hereof) and otherwise subject to all of the other terms, covenants and conditions of this Lease insofar as the same may be applicable to a month-to-month tenancy.

CIF and WRIT agreed to two extensions of each lease.[4] In the second amendment, the leases were extended indefinitely on a month-to-month basis, leaving either party with the authority to terminate the leases by providing written notice to the other party 30 days before the proposed date of termination. The second amendment also modified the original holding over provision of the lease, specifying:

In the event Landlord or Tenant shall give the other party such written notice of termination as aforesaid, this Lease shall cease and terminate as of the termination date set forth in such notice as if such termination date were the last day of the term of this Lease. On the termination date specified in such notice, Tenant shall, without notice, quit

---

4. The first amendment to the leases was entered into on September 16, 1999, and the second on May 30, 2005.

and surrender the Demised Premises to Landlord in accordance with the provisions of the Lease. TIME IS OF THE ESSENCE. Any holding over by the Tenant after the termination date shall be an unlawful detainer and Tenant shall be subject to immediate eviction. Tenant acknowledges and agrees that under no circumstances may Tenant hold over in the Demised Premises after termination date unless Tenant obtains Landlord's prior written consent to do. Tenant further acknowledges and agrees that if Tenant does hold over after the termination date without obtaining Landlord's prior written consent, (i) any notice and cure period otherwise granted to Tenant under the Lease before Landlord may exercise its rights and remedies thereunder shall be null and void; (ii) Tenant shall pay Landlord a holdover fee of three (3) times the Basic Annual Rent then in effect, prorated on a daily basis, per day for each day that Tenant holds over past the termination date set forth in Landlord's notice ("Daily Holdover Use and Occupancy Fee"); (iii) Landlord may accept the Daily Holdover Use and Occupancy Fee and concurrently commence legal proceedings to regain possession of the Demised Premises and/or pursue any and all other rights and remedies available to Landlord under the Lease and/or the law; and (iv) in addition to any other rights and remedies provided to the Landlord under the lease and/or the law, Tenant shall indemnify and hold Landlord harmless from and against any and all loss, liability, damages and expenses (including without limitation, consequential damages, attorneys' fees, the costs of investigation and settlement of any claims) sustained or incurred by Landlord on account of or resulting from such failure to vacate.

Both leases required a surrender of the Demised Premises upon the termination date of the leases. They required CIF to provide an environmental inspection certificate declaring that the "Demised Premises" were free of hazardous substances:

Within ten (10) days following Lessee's re-delivery of possession of the Demised Premises to Lessor ("Delivery

Date"), Lessee shall provide Lessor with a certification from an independent, licensed inspector, dated as of the Delivery Date, which shall certify to Lessor that:

a) Inspector has made a site inspection of the Demised Premises, and

b) The Demised Premises at the Delivery Date were free of dangerous and/or toxic substances or materials in quantities or concentration which would require clean up under applicable governmental regulations.

### Termination of the Leases

In a letter dated July 15, 2005, CIF provided notice to WRIT that it was terminating its leases with WRIT, effective August 15, 2005.[5] In the notice, CIF wrote that it "will be in contact with [WRIT] regarding the removal of the underground tanks." On August 15, 2005, CIF shut down its businesses and vacated both sites.

In a letter dated August 19, 2005, counsel for WRIT advised B & E Automotive ("B & E"), a mechanic shop that worked out of one of the service stations on the leased properties, that it, as CIF's subtenant, had remained on the property past expiration of CIF's lease term. WRIT demanded that B & E "vacate the Premises in accordance with the terms of Tenant's lease," but it left open the possibility of negotiating a direct lease with B & E. WRIT sent a copy of the letter to CIF.

In a letter dated August 26, 2005, counsel for WRIT advised CIF, that, "while [CIF] has ceased its operations on the premises, a subtenant of [CIF], B & E Automotive Services, Inc., continues its use and occupancy" of one of the plots of land. WRIT further stated that CIF "has not yet removed its underground storage tanks or provided the environmental inspection certification required upon termination of possession." WRIT warned that it would not deem CIF "to have

---

**5.** Prior to terminating the lease, CIF tried to renegotiate the leases with WRIT; it desired to lease the entire corner and invest in modernizing the property. WRIT declined, explaining that it had decided to convert the property into a bank and demolish the service station buildings.

vacated and surrendered possession of the Premises" until CIF removed its subtenant, the underground storage tanks, and provided the environmental certificate, and WRIT stated that it reserved its right under the leases to collect daily holdover fees. Counsel for WRIT also confirmed a recent conversation

> in which [CIF] advised that [it] intended to remove the underground storage tanks, conduct all required and necessary remediation and abatement due to any spillage or discharge of any oil, petroleum or chemical liquids or solids and any other hazardous substance contamination, and have an independent inspection conducted of the premises to provide certification that the premises are free of dangerous and/or toxic substances or materials. . . .

Between January 30 and February 1, 2006, CIF removed the gasoline storage tanks and contamination was discovered. CIF removed tons of contaminated soil, and retained an environmental consultant to proceed with a site assessment.

By letter dated February 27, 2006, WRIT sent a Notice of Default to CIF, stating that: (1) CIF had failed to remove its tanks by the termination date; (2) CIF had not provided the environmental inspection certificate; (3) CIF owed WRIT $12,987.71 in attorneys' fees, consultant fees, and rent as of February 20, 2006; (4) two of CIF's rent checks were returned by the bank, and therefore, not paid; (5) the amount owed as of the date of the letter was $21,311.87; and (6) B & E remained on the premises.

CIF continued to work on remediation until approximately March 2007, at which time CIF decided to "shut the job down" and discontinue remediation efforts. At this point, WRIT took over remediation of the property.

On May 15, 2007, WRIT combined the two sites and leased it to Susquehanna Bank. The building plan for the new bank required demolition of both service station buildings, which occurred in October 2007.

## The Lawsuit

On October 29, 2007, WRIT filed its Complaint against CIF, and on November 5, 2008, it filed its Amended Complaint. CIF asserted eight claims in its Amended Complaint: four tort claims; two breach of contract claims; and two claims seeking a declaratory judgment regarding CIF's continuing liability to remediate the contamination of the soil and groundwater. WRIT dismissed three of its four tort claims, and the trial court granted CIF's motion for judgment on the remaining tort claim, finding that CIF was not liable under a negligence theory.

In the two breach of contract claims, one for each lease, WRIT alleged that CIF had failed to keep the properties "in the condition required by law, in that petroleum products have contaminated the soil and groundwater," and it failed "to surrender possession of the [properties] upon termination in the condition required by the [leases]." WRIT requested a judgment of $3,000,000, consisting of rent at the holdover rate and additional damages, including attorneys' fees and costs and expenses associated with remediation.

In its claims for declaratory judgment, WRIT requested that the trial court "declare that, in addition to a money judgment," CIF be liable to WRIT "for all damages until such date as the [properties are] in the condition that [they were] required to be upon surrender of possession" and that CIF pay all fees, costs, and other "damages incurred by WRIT in order to remediate the environmental contamination and restore the [properties] to the condition in which [they were] required to be upon surrender of possession" at termination of the lease.

Trial commenced in April 2009 and continued for eight days.[6] The majority of WRIT's case related to establishing CIF's liability for the soil and groundwater contamination. CIF characterizes its defense as

---

6. The trial occurred on the following days: April 27 through April 30, 2009, and June 29 through July 2, 2009.

primarily ... establishing that: (i) the certificate require-
ment applies only to the condition of the "Demised Premis-
es," as defined in the leases, which means the service station
buildings; (ii) there was no evidence that the buildings were
contaminated or that WRIT otherwise suffered any losses
associated with the absence of a certificate; (iii) CIF is
responsible for soil and groundwater contamination under
Section 2 of the Addenda (the "indemnity clause") only if
the contamination came to exist at the property during
CIF's tenancy; (iv) the property was heavily contaminated
prior to CIF's tenancy; and (v) there is no evidence that
any spills, leaks or other discharges of petroleum occurred
during CIF's tenancy.

With respect to the holdover issue, there were three
grounds on which WRIT asserted that CIF was a holdover
tenant: (1) the failure to remove underground fuel tanks; (2)
the failure to provide an environmental certificate; and (3) B
& E's continued presence. With respect to the fuel tanks,
John Haines Phelps, the President of CIF, testified that CIF
did not remove the tanks because, based on the language in
the lease, it believed that ownership of the tanks vested in
WRIT upon termination of the lease. It discovered, however,
that WRIT never registered the tanks in its name, leaving the
tanks registered in CIF's name. Concerned that the Mary-
land Department of Environment ("MDE") would have found
CIF liable for unauthorized abandonment of the tanks,[7] CIF
removed the tanks between January 30 and February 1, 2006.
CIF continued to pay base rent for both properties during
that time.

With respect to the failure to provide an environmental
inspection certificate, Mr. Phelps testified that CIF did not
deliver the certificate because it was aware that WRIT was
going to demolish the buildings and convert the property into

---

7. The environmental regulations governing underground storage tanks
provide that, if an underground storage tank system is closed for more
than six months, the owner or operator must permanently close the
underground storage tank system if it does not meet certain perform-
ance standards. COMAR 26.10.10.01(C) (2010).

a bank. CIF construed the lease as requiring a certificate that the building, not the surrounding area, was free of hazardous substances, and given that the buildings were going to be demolished, it concluded that a certificate of inspection of the buildings was "unnecessary."

With respect to the claim regarding B & E, William Gusler, a WRIT employee and maintenance engineer, testified that B & E was operating on the leased property in 2003, and did not leave the site until March 2006. CIF, however, claimed that it first heard of B & E's existence at the start of the dispute between CIF and WRIT in 2007. In accordance with its lease with WRIT, CIF subleased the property to independent dealers who operated the service stations at the sites. CIF's leases with the independent dealers permitted additional subleases with CIF's consent. None of the independent dealers, however, requested or received consent from CIF for a sublease. According to Mr. Phelps, if there had been a B & E sign on either of the buildings, it would have been "a subentity of the dealer" that had entered into a sublease agreement with CIF. Mr. Phelps testified that CIF had never noticed a B & E sign on either of the two service station buildings.

### The Circuit Court's Ruling

On January 22, 2010, the circuit court issued its Memorandum Opinion and Order. The court ruled against WRIT on the counts seeking a declaratory judgment holding CIF liable for future related costs. It found that CIF was not liable for environmental contamination that predated its tenancy, and that WRIT had not shown by "a preponderance of the evidence" that CIF caused the contamination of the sites.

The court further refused, for two reasons, to award WRIT damages based on lost rental income as a result of the contamination of the sites. First, there was insufficient evidence that CIF caused the contamination. Second, it found that WRIT failed to show damages, noting that WRIT intended to use the land for a bank, and the evidence showed that

construction could occur while remediation efforts were occurring.

The court then addressed the issue of "holdover rent." It noted that WRIT claimed that CIF "was a holdover tenant by not removing the tanks from the premises in August 2005 when CIF provided notice that they were vacating." The court, citing *Nehi Bottling Co. v. All–American Bottling Corp.*, 8 F.3d 157 (4th Cir.1993), and *Longmier v. Kaufman,* 663 S.W.2d 385 (Mo.Ct.App.1983), found persuasive the argument that "this is akin to a residential tenant leaving all of his personal belongings in an apartment after he has informed management that he is vacating." The court rejected CIF"s argument that this did not constitute holding over because, pursuant to the terms of the lease, the tanks were to become WRIT"s property, stating that "CIF was well aware that WRIT was not interested in leasing the property for a gasoline station, but rather they wanted to convert it to a bank." Accordingly, the court found that CIF was holding over from September 2005 through January 2006, and WRIT was entitled to holdover rent for that period of time in the amount of $123,460.81.[8]

The court then addressed WRIT's claim that CIF was a holdover tenant because it allowed "B & E Automotive to use the premises from August of 2005 until March of 2006." Although the court stated that it did "not have sufficient evidence as to any business relationship" between B & E and CIF, the court found that CIF "had notice that B & E Automotive was utilizing their leased land, so in [the] light most favorable to CIF, B & E was a trespasser and CIF was obligated under the rental agreements to have B & E removed from the premises when CIF left in August of 2005." The court calculated the holdover rent for the period, September 2005 to March 2006, to be $174,321.99 and credited rent

---

8. The holdover fee was three times the amount of rent, prorated over the number of days CIF was a holdover tenant. The court calculated the rent for each month and then deducted $41,620.80, the $8,324.16 per month in rent that CIF paid for the period from September 2005 to January 2006.

payments in the amount of $41,620.80, finding that WRIT was entitled to $132,701.19.[9]

The court then addressed WRIT's argument that CIF was a holdover tenant "because of their failure to provide the environmental certificate showing the 'demised premises' to be free from contamination." The court agreed with CIF that the certificate was required only for the buildings, and not the grounds, finding that the environmental certificate requirement "does not extend liability to CIF for underground soil and water contamination." The court found that CIF had a duty to "have an inspector certify that the buildings themselves are free from hazardous waste and other environmental contamination." It concluded that WRIT "was entitled to charge holdover rent until CIF could certify that they had not left the demised premises in a dangerous state." The court found CIF liable to WRIT for holdover rent from September 2005 through October 2007, when the buildings were demolished, in the amount of $624,621.09.

The court next addressed WRIT's request for attorneys' fees. Although WRIT requested fees in the amount of $708,411.10, the court found that it was entitled to recover only for the fees related to collecting the holdover fees. Referring to the Maryland Rules of Professional Responsibility, and noting that the hourly rates billed were high for attorneys in Carroll County, the court awarded attorneys' fees in the amount of $25,000. The total monetary award to WRIT was $649,621.09.

On March 8, 2010, CIF filed a Motion for Relief from Judgment and a New Trial. It argued that the term "holding over" in the leases meant possession of the properties past expiration of the lease term, and that none of the conduct cited by the court—failure to deliver the certificate, B & E's

---

9. The court noted that the holdover rent for CIF's failure to remove the storage tanks "will naturally merge, and be covered by the debt for B & E Automotive['s] presence, since it is for the same period plus two additional months."

presence, or removal of the tanks—constituted possession by CIF.

On March 8, 2010, WRIT filed a Motion to Alter or Amend Judgment, requesting that the trial court include an award of prejudgment interest on the holdover rent. Using a six percent interest rate, WRIT requested $127,056.89 in prejudgment interest.

On April 23, 2010, the court denied both motions. On May 4, 2010, CIF filed its Notice of Appeal from the trial court's denial of its motion. WRIT filed its Notice of Appeal on May 13, 2010. In their respective appeals, the parties reassert many of the arguments made in their post-judgment motions. Because the parties agree that the leases are virtually identical, we will refer to the agreements as the "lease."

### STANDARD OF REVIEW

Our review of the case is guided by Md. Rule 8–131(c), which provides:

**Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

With respect to the court's factual findings, " '[i]f there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous.' " *Jackson v. 2109 Brandywine*, 180 Md. App. 535, 567, 952 A.2d 304 (quoting *YIVO Institute For Jewish Research v. Zaleski*, 386 Md. 654, 663, 874 A.2d 411 (2005)), *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008). With respect to the court's determination of legal questions or conclusions of law, however, we do not give deference to the circuit court's conclusions. *Id.* Instead, we apply a *de novo* standard of review to determine whether the court's conclusions are legally correct. *Id.*

## DISCUSSION

## I.

### "Holding Over"

CIF initially contends that the circuit court erred in finding that it was a "holdover tenant." It argues that the court should have focused on whether CIF "retained possession of the Demised Premises" after the termination of the lease, but the court "eschewed such an analysis," and instead, it approached the issue on "an *ad hoc* basis, and in a haphazard way, without any reference to Maryland authorities governing holdovers." CIF asserts that the court's finding that it was holding over under the lease lacks a valid legal basis.

WRIT disagrees. It states that CIF "incorrectly assumes . . . that a tenant must be physically present on the premises to be a holdover tenant." WRIT argues, instead, that the decision whether a tenant is holding over is "based upon a factual determination of various circumstances," and a tenant can be shown to have continued its physical possession of the property through conduct other than continued physical presence. It asserts that the circuit court's determination that CIF was a holdover tenant was supported by the law and not clearly erroneous.

The term "holding over" means a tenant under a lease who continues in possession of the leased premises after the expiration of the lease. *See* BLACK'S LAW DICTIONARY 800 (9th ed. 2009) (defining "holding over" as "[a] tenant's action in continuing to occupy the leased premises after the lease term has expired"); *West v. Humble Oil & Refining Co.*, 261 Md. 190, 193, 274 A.2d 82 (1971) (referring to tenants who "hold over" as tenants who "occupy and use the premises" after the expiration of the lease); *Nehi Bottling Co. v. All–American Bottling Corp.*, 8 F.3d 157, 163 (4th Cir.1993) ("Holdover occurs when a tenant in possession under a lease continues in possession beyond expiration of the lease.").

The definition of "holding over" in the lease is in accord with this definition. The original lease referred to "holding over"

as "remain[ing] in possession" of the premises. The second amendment to the lease referred to holding over as an "unlawful detainer" and a "failure to vacate," terms that clearly equate holding over with a failure to surrender possession of the property. *See* BLACK'S LAW DICTIONARY 513 (9th ed. 2009) (defining "unlawful detainer" as "[t]he unjustifiable retention of the possession of real property by one whose original entry was lawful, as when a tenant holds over after lease termination despite the landlord's demand for possession"); *id.* at 1688 (defining "vacate" as "to surrender occupancy or possession; to move out or leave").

The parties do not contest this definition of the term "holding over." They do dispute, however, whether the facts here show that CIF continued its possession of the premises after the lease term ended.

The typical way that a tenant retains possession of leased premises is to physically remain on the premises at the expiration of the lease term. That did not occur here. CIF vacated the premises when the lease terminated.

■ WRIT argues, however, that a tenant's continued physical presence is not necessary to constitute holding over. It notes that courts have found a holdover tenancy in a variety of circumstances other than the tenant's physical presence at the site, including when the tenant leaves equipment on the property, fails to return the keys, or leaves the property in a state of disrepair. We agree that there can be circumstances justifying a finding that a tenant is holding over even after the tenant has physically left the premises. The circumstances, however, must indicate the tenant's continued control and possession of the premises, which interferes with the lessor's use or possession of the premises. *Compare Magner v. Barrett*, 139 A.D. 172, 123 N.Y.S. 690, 690 (N.Y.App.Div.1910) (personal items left on premises, keys not returned, and other facts showing disregard of lessor's right permitted a finding that the tenant was holding over) *with Caserta v. Action for Bridgeport Comty. Dev., Inc.*, 34 Conn.Supp. 561, 377 A.2d 856, 857 (1977) (where there was no evidence regarding the

size of the machine left on the leased premises from which the court could determine the extent to which the presence of the machine interfered with the lessor's use or possession of the premises, the court did not err in finding that the tenant was not a holdover tenant); *Comedy v. Vito*, 492 A.2d 276, 278 (D.C.1985) (failure to remove an exterior sign and glass cabinet did not interfere with the landlord's use of the property to an extent sufficient to transform the tenant into a holdover tenant).

With these principles in mind, we review the three circumstances that the trial court found constituted holding over by CIF in violation of the lease.

## A. Removal of Fuel Tanks

As indicated, the lease provided that CIF would install three new gasoline tanks. The circuit court found that CIF was a holdover tenant from September 2005 through January 2006 because it did not remove the underground fuel tanks.

CIF contends that the circuit court's ruling in this regard was erroneous for three reasons. "First, the express provisions of both leases make WRIT the owner of the tanks at the end of the lease term or option period." "Second, the holdover provisions of the leases apply expressly and exclusively to the 'Demised Premises,'" and because the tanks were buried in property adjacent to the Demised Premises, a failure to remove the tanks does not constitute "holding over." Third, no provision of the lease required CIF to remove the tanks on the lease termination date.

WRIT contends that the trial court correctly found that WRIT was entitled to holdover rent based on the failure to remove the underground storage tanks. WRIT argues that CIF "was the registered owner of the tanks," and CIF's "act of leaving the underground storage tanks at the Property does not meet the commonly understood definition of having vacated the Property and thus supports the Circuit Court's finding that CIF was a holdover tenant." It points to CIF's continued payment of the base rent through January 2006, and it argues

that the payment of rent must be construed as an acknowledgment that CIF remained in possession until the tanks were removed.[10]

■ As previously indicated, a tenant's failure to remove its personal property from the leased premises may be deemed to be holding over. The trial court relied on cases so holding, *see Nehi Bottling Co. v. All–American Bottling Corp.,* 8 F.3d 157 (4th Cir.1993), and *Longmier v. Kaufman,* 663 S.W.2d 385 (Mo.Ct.App.1983), in finding that the failure to remove the fuel tanks was "akin to a residential tenant leaving all of his personal belongings in an apartment after he has informed management that he is vacating."

In this case, however, CIF argued that the tanks were not CIF"s property because, pursuant to the terms of the lease, the tanks became WRIT"s property at the termination of the lease. The circuit court did not specifically address whether WRIT was the owner of the tanks pursuant to the lease, finding only that "CIF"s argument is unpersuasive because CIF was well aware that WRIT was not interested in leasing the property for a gasoline station, but rather they wanted to convert it to a bank."

Thus, we are presented with two issues. First, we must determine whether the tanks were the property of CIF or WRIT. Second, if the tanks were WRIT"s property, we must resolve, as a matter of law, whether a tenant can be found to be holding over where the property left behind is owned, not by the tenant, but by the landlord. The parties have not cited, and we have not found, any cases addressing this legal issue.

---

**10.** WRIT further argues that CIF's return to the property "on many occasions after 'terminating' the [l]ease to install monitoring wells and take soil borings"—all without WRIT's consent—independently establishes that CIF was a holdover tenant. CIF responds by arguing that (1) WRIT *requested* that CIF return to the property to remove the tanks and deal with the environmental hazards, and (2) the trial court never found that "CIF's intermittent returns to the property to perform work at the insistence of WRIT constituted holding over." It asks us to reject "WRIT's attempt to interject a new basis for holdover liability, which was neither considered nor addressed by the trial court."

■ Beginning with the first issue, as CIF notes, the lease provided that WRIT would be the owner of the tanks at the end of the lease period. The lease required CIF to "install three new gasoline tanks," and it provided that all " 'Additions' (including all existing or new) shall, at the end of the term (or options period) belong to [WRIT] ( [including] equipment, improvements, gasoline tanks, islands, canopies, etc.)." Thus, we agree with CIF that, pursuant to the terms of the lease, once the lease terminated, WRIT was the owner of the tanks.[11]

WRIT argues, however, that CIF waived the provision in the lease providing that the tanks became the property of WRIT upon expiration of the lease. Specifically, WRIT relies on: (1) CIF''s letter terminating the lease, stating that CIF would "contact WRIT regarding removal" of the tanks; and (2) a letter from WRIT to CIF confirming "a recent conversation, in which [CIF] advised that [it] intended to remove the underground storage tanks[.]"

■ CIF disagrees with WRIT''s argument that "the leases were modified by the parties in such a way as to vest ownership in CIF." It argues that, "even if CIF''s course of conduct could be construed as an assumption of responsibility to remove the tanks (which it cannot); the assumption does not affect ownership of the tanks." [12]

---

**11.** As indicated, Mr. Phelps testified that WRIT wanted to own the tanks because it wanted "turn-key usable gas station[s] to be able to sublet" after termination of its lease with CIF.

**12.** CIF disputes that it assumed responsibility to remove the tanks. With respect to the statement in the termination letter that it would "contact [WRIT] regarding the removal of the underground tanks," CIF argues that this was a reference to "CIF's desire to advise WRIT of its obligations under applicable regulation with respect to tank removal." CIF explained that it needed to know whether WRIT intended to register the tanks with MDE, in its own name, noting that, if WRIT did not, CIF could be left with liability for the tanks because they were still registered in its name when it terminated the lease. With respect to the letter in which WRIT stated that it was confirming a conversation where CIF communicated its intent to remove the tanks, CIF argues that this was a "self-serving letter."

We agree with CIF. Even assuming that the correspondence relied upon by WRIT showed that CIF agreed to remove the tanks, there is nothing to suggest that CIF agreed to assume ownership of the tanks, contrary to the terms of the lease.

The record reflects that WRIT was the owner of the tanks. We hold that the failure of a tenant to remove from the premises property owned by the landlord does not constitute holding over. CIF's failure to remove the tanks owned by WRIT did not render CIF a holdover tenant. The circuit court erred in finding to the contrary.

### B. Failure to Deliver Inspection Certificate

The circuit court next found that CIF was holding over based on CIF's failure to provide an environmental certificate showing the demised premises to be free from contamination. It agreed with CIF's contention that the demised premises constituted the buildings, not the adjacent grounds, but it found that CIF was holding over until it certified that it "had not left the demised premises in a dangerous state." It found CIF liable to WRIT for holdover rent from September 2005 through October 2007, when the buildings were demolished.

CIF contends that the circuit court erred in finding that its failure to deliver the environmental certificate under the lease constituted holding over. It argues that the court's finding "turned a simple breach of contract, for which WRIT suffered no damages, into a 'holdover' under the leases, and it did so in the absence of any finding that CIF retained possession of the premises or denied possession to WRIT." [13]

CIF further argues that the certificate requirement was not a condition precedent to proper surrender of the property. It notes that Section 2a of the Addenda "requires the delivery of an inspection certificate "[w]ithin ten (10) days following [CIF]'s re-delivery of possession of the Demised Premises to

---

13. CIF asserts that it "withheld the certificate because it knew WRIT would not be harmed by a failure to deliver a certificate attesting to the condition of buildings that were slated for demolition."

[WRIT] ('Delivery Date')." It asserts that the failure to comply with the certificate requirement cannot constitute continued possession of the premises because the requirement was not applicable until after CIF surrendered possession.

WRIT argues that the circuit court properly determined that CIF was a holdover tenant due to its failure to provide the certificate. It argues that: (1) delivery of the property was required to be "in accordance with the provisions of the Lease,"; (2) the provision of the lease required an environmental certificate as of the delivery date; (3) no environmental certificate was given to WRIT; and therefore, (4) CIF "did not properly deliver possession of the property back to WRIT" as required by the lease.

 WRIT's argument, essentially, is that CIF breached a term of the lease.[14] A mere breach of the lease, however, does not necessarily constitute holding over. As indicated, the relevant inquiry in deciding whether a tenant was "holding over" is whether the tenant's actions amounted to continued *possession* of the premises after expiration of the lease term, which interfered with the landlord's use or possession of the property. Although CIF's failure to deliver the certificate may have constituted a breach of the lease, there was no evidence presented that supported a finding that CIF's failure in this regard interfered with WRIT's possession and control of the premises.[15] The circuit court erred in finding that

---

**14.** As indicated, the lease provided as follows:

[CIF] shall provide [WRIT] with a certification from an independent, licensed inspector, dated as of the Delivery Date, which shall certify to Lessor that:

a) Inspector has made a site inspection of the Demised Premises, and

b) The Demised Premises at the Delivery Date were free of dangerous and/or toxic substances or materials in quantities or concentration which would require clean up under applicable governmental regulations.

**15.** Actual contamination of the premises could, in some circumstances, affect the landlord's subsequent possession of the property. Here, however, the contamination was found on the land, not the buildings

CIF''s failure to deliver the environmental certificate rendered CIF a holdover tenant.

## C. Failure to Remove B & E Automotive Services, Inc.

The circuit court next found that CIF was holding over from September 2005 to March 2006 based on the presence of B & E. In that regard, the circuit court stated as follows:

> The court places significant weight on the testimony of William Gusler that B & E Automotive began occupying the site in 2003. B & E did not vacate the property until March of 2006. The court does not have sufficient evidence as to any business relationship between B & E and CIF. The court however does find that the CIF had notice that B & E Automotive was utilizing their leased land, so in [the] light most favorable to CIF, B & E was a trespasser and CIF was obligated under the rental agreements to have B & E removed from the premises when CIF left in August of 2005. Therefore, CIF is liable for the presence of B & E Automotive from [ ] September of 2005 (the first month that CIF would be considered a holdover tenant) until when they vacated (March 2006).

(Footnote omitted).

CIF contends that the circuit court erred in finding that "CIF''s failure to remove a 'trespasser' [B & E] from the demised premises during the term of the lease[ ]" constituted a "holdover by CIF." Referring to the court's finding that it was obligated under the lease "to have B & E removed from the premises when CIF left in August of 2005," it states that, once the lease term had expired, it had no standing or ability to take legal action to remove B & E as a tenant. With respect to any pre-termination obligation, it makes two arguments. First, it asserts that WRIT acquiesced "in B & E's presence over a two year period," and therefore, "WRIT waived any right to assert a claim based on B & E's presence

---

that the circuit court found were the subject of the lease, and the court found that CIF was not responsible for the contamination.

for the first time after the lease termination date." [16] Second, it argues that the holdover provision in the lease applies only to "[a]ny holding over by Tenant," and not by a trespasser with whom CIF had no contractual or leasehold relationship.

WRIT responds that it was CIF's "responsibility to oversee and control the activities" on the property "and ensure that any persons occupying the [p]roperty vacated it at the same time as or before [CIF's] alleged termination." WRIT argues that CIF "had the duty under the [lease] upon termination to return the [p]roperty to WRIT free and clear of any continued occupants, whether they were authorized assignees, subtenants, or trespassers."

We agree with WRIT that, if B & E was a subtenant, CIF was responsible under the lease to ensure that it vacated the premises upon the termination of the lease. Other courts have so held, finding the tenant liable to the landlord as a holdover tenant if a subtenant holds over and continues to occupy the premises after the lease is terminated. *United States v. Morgan,* 196 F.Supp. 345, 350 (D.Md.1961), *aff'd,* 298 F.2d 255 (4th Cir.1962); *Sanchez v. Eleven Fourteen, Inc.,* 623 A.2d 1179, 1181 (D.C.1993). *Fields v. Conforti,* 868 N.E.2d 507, 514 (Ind.Ct.App.2007). Here, however, based on the evidence and the circuit court's factual findings, B & E was not CIF's subtenant.

The evidence regarding B & E's presence at the premises, and any relationship with CIF, was limited. William Gusler, a maintenance engineer for WRIT, testified that B & E was operating on the leased property in 2003, and it did not leave the site until March 2006. He testified that B & E had a sign on the back of the building. It was "a white metal sign with red letters that said B & E Automotive," and B & E took the sign when it left in March 2006.

---

**16.** CIF explains that WRIT was aware of B & E's presence, and it was aware that, because there was no sublease as required by the lease, B & E's presence was unauthorized, and its acquiescence to B & E's presence waived any right to later complain about B & E's presence.

Mr. Phelps, the President of CIF, testified that he was not aware of B & E's existence at the premises until the dispute and this litigation began.[17] He explained that, in accordance with its lease with WRIT, CIF subleased the property to independent dealers, who operated the service stations at the sites. CIF's leases with the independent dealers permitted additional subleases with CIF's consent, but none of the independent dealers requested or received consent from CIF for a sublease.

Mr. Phelps did not recall seeing a B & E sign on either of the two service station buildings. He testified that, if he had seen such a sign, he would have assumed it was a "sub-entity of the dealer." Mr. Phelps further testified that CIF monitored the sites, stating that, approximately once a month, "a franchise sales rep . . . call[ed] on the retailers to make sure they [were] in compliance with the retail standards."

Based on this evidence, the court made several factual findings. Initially, it found that there was not "sufficient evidence as to any business relationship between B & E and CIF." The court further found, however, that "CIF had notice that B & E Automotive was utilizing their leased land, so in [the] light most favorabl[e] to CIF, B & E was a trespasser."

■■■ These findings indicate that, although the court found that B & E was not CIF's subtenant, it did not credit Mr. Phelps' testimony that CIF was unaware of B & E's presence at the premises prior to the termination of the lease. At oral argument, when questioned regarding what evidence in the record supported the court's finding that CIF had notice that

---

**17.** Subsequent to the termination of the lease, CIF was on notice of B & E's presence. · In a letter dated August 19, 2005, counsel for WRIT advised B & E, with a copy to CIF, that it had remained on the property past expiration of CIF's lease term, and WRIT demanded that B & E "vacate the Premises in accordance with the terms of Tenant's lease." In a July 19, 2007, e-mail to Mr. Phelps, Joseph Antonelli, a CIF employee, advised Mr. Phelps that the service station "[b]ays remained occupied for an unknown amount of time" after the dealer vacated the station on August 1, 2005. According to CIF's analysis, however, this correspondence is irrelevant because, once the lease was terminated, CIF had no ability to take legal action to remove B & E.

B & E was operating at the premises, counsel pointed to the testimony that a B & E sign existed on the premises, and Mr. Phelps' testimony that a company representative visited the sites once a month to check on the retailers.[18] This evidence, albeit limited, supports the court's finding that CIF had notice that B & E was operating on the premises, and the court's finding in this regard, therefore, is not clearly erroneous.

Thus, the pertinent facts that guide an analysis of whether CIF was a holdover tenant, as found by the circuit court, are that B & E was not CIF"s subtenant, but CIF had notice, prior to termination of the lease, of B & E's presence at the premises as a trespasser. The question before us boils down to whether a tenant, who fails to remove a known trespasser at the expiration of the lease term, is a holdover tenant. This presents a question of law. Neither party cites any case addressing this issue.

 On the facts as found by the trial court, we hold that CIF was not holding over due to the presence of B & E. As indicated, there is authority for the proposition that a tenant who enters into a sublease with another person will be held liable for holding over if the sublessee fails to vacate the premises at the expiration of the lease. *See Morgan*, 196 F.Supp. at 350; *Sanchez*, 623 A.2d at 1181. In such a situation, the sublessee could be viewed as standing in the shoes of the original tenant, and the original tenant has a remedy against the subtenant. If the subtenant does not vacate the premises, and the sublease contains a covenant to surrender possession at the expiration of the tenant's lease, the tenant may recover damages, based on a breach of contract, for the amount of holdover rent the tenant is compelled to pay the landlord. *Phelan v. Kennedy*, 185 A.D. 749, 173 N.Y.S. 687, 690 (N.Y.App.Div.1919).

---

**18.** Neither of the parties addressed this issue in their written closing arguments below. Indeed, in WRIT's 55 page written closing argument, it devoted only one page to its claim that CIF was liable for holding over, with two sentences devoted to B & E.

That is not the case here, however, where the court made a factual finding that there was no sublease or other contractual relationship between CIF and B & E. In this situation, it is not clear what, if any, actions were available to CIF to remedy the situation. CIF had no contractual cause of action against B & E. And WRIT does not dispute CIF's argument that, after the lease terminated, CIF had no authority to remove B & E from the premises. Although there are causes of action available to a person with a right to possession of premises to take against a person interfering with that right, *see* Md.Code (2003 Repl.Vol.) § 14–109.1(b) of the Real Property Article ("A person who is not in possession of property and claims title and right to possession may bring an action for possession against the person in possession of the property."); *Mitchell v. Baltimore Sun Company*, 164 Md.App. 497, 508, 883 A.2d 1008 (2005) (the tort of trespass is a cause of action for interference with a possessory interest in property without consent), *cert. denied*, 390 Md. 501, 889 A.2d 418 (2006), these causes of action were not available to CIF once the lease was terminated, at which point CIF had neither title nor possession of the premises.

B & E's action in remaining on the property as a trespasser after CIF had vacated the premises cannot be attributed to CIF, and it did not constitute holding over by CIF in violation of the lease.[19] The circuit court erred in finding to the contrary.

We have considered all three grounds on which the court found that CIF was a holdover tenant. Because we have concluded that none of these three grounds support a finding that CIF was holding over, we reverse the circuit court's

---

**19.** As WRIT notes, the lease provided that, "[e]xcept for subletting to a retail gasoline dealer/franchise, [CIF] shall not ... permit other persons to occupy the Demised Premises or any part thereof." It may be that CIF breached this provision of the lease, if it had notice of B & E's presence for several years and took no steps to secure written consent from WRIT. WRIT, however, did not assert a breach of contract claim in this regard.

judgment awarding WRIT $624,621.09 in holdover fees.[20]

## II.

### Attorneys' Fees

WRIT next challenges the circuit court's award of attorneys' fees. In this regard, the court ruled as follows:

WRIT has requested the court enter an award for attorney's fees and trial related expenses in the amount of $642,942.97. The court agrees that WRIT is entitled to recover for attorney's fees and trial expenses related to collecting holdover rent. The court has thoroughly reviewed the requested relief. The court notes that a substantial part of the litigation and court expenses concerns the portions of the trial related to soil and water contamination, as opposed to holdover rent. The court is guided by the Md. Rules for Professional Responsibility, Rule 1.5[,] which holds that attorneys shall be compensated at a reasonable hourly rate and for reasonable hours worked. The bill includes the rates for twelve attorneys working on this case as well as trial preparations and expert witnesses fees.

WRIT presented the testimony of attorney Michael C. Preston, Esq. regarding the reasonableness of the hourly rate for attorneys in the Greater Baltimore–Washington D.C. Metropolitan area with 20 years plus experience. The court finds the hourly rates presented to be high for Carroll County attorneys as opposed to other counties in the Greater Baltimore–Washington D.C. Metropolitan area. In addition, the court will only enter an award for the portion of the litigation that concerned the holdover rent. The court finds that a fair and just award related to attorney's fees in this case will be $25,000.00.

---

**20.** Based on our conclusion that the court erred in finding that CIF was liable for holding over, we need not address CIF's argument that the contract's holdover provision was an unenforceable penalty. Similarly, we need not address WRIT's claim that it was entitled to prejudgment interest on the holdover fee award.

WRIT contends that the trial court erred "by not awarding WRIT additional attorneys' fees and expenses," asserting on appeal that the expenses through closing argument amounted to $708,411.10. WRIT argues that the trial court's "extremely abbreviated discussion of 'Attorney's Fees,' . . . does not demonstrate a proper exercise of discretion," and it characterizes the court's determination as "an arbitrary one, with no basis in the record supporting this severely reduced figure." WRIT contends that, pursuant to three separate indemnity provisions in the lease, "substantially all of its attorneys' fees and expenses incurred, whether related to the holdover issue or not, are properly subject to an award of fees and expenses." It goes on to argue that, even if the trial court was correct in limiting the amount of fees, "all fees and expenses incurred through the holdover period ending in October, 2007, as well as all subsequent fees and expenses reasonably related to the holdover issue, should be considered and awarded to WRIT." It requests that we remand to the trial court for another determination on fees.[21]

CIF asserts that WRIT's argument in the circuit court, and the court's award, was based on only one paragraph of the Addenda,[22] and therefore, any argument relying on other indemnity provisions is unpreserved for appellate review. In any event, CIF argues, "WRIT is not authorized to recover attorney[s'] fees under either of the two new provisions." CIF further argues that the trial court did not abuse its

---

21. In light of our determination that CIF is not liable for holding over, a remand at this point likely would not be in WRIT's best interest. CIF did not argue on appeal, however, that the award of attorneys' fees should be reversed because the court's finding that it was holding over was erroneous.

22. This indemnity clause provided: "In the event that Lessee breaches the covenants set forth in this Section, or if the presence of Hazardous Waste on the Demised Premises otherwise occurs for which Lessee is legally liable to Lessor for damages resulting therefrom. . . . Lessee shall indemnify Lessor and hold Lessor harmless from any and all claims, judgments, damages . . . liabilities or losses (including . . . attorney's fees . . .) . . . which arise during or after the term as result of such contamination . . . [.]"

discretion in awarding attorneys' fees commensurate with the issues on which WRIT prevailed, noting that "the overwhelming majority of the issues were decided against WRIT."

 "Maryland generally adheres to the common law, or American rule, that each party to a case is responsible for the fees of its own attorneys, regardless of the outcome." *Friolo v. Frankel,* 403 Md. 443, 456, 942 A.2d 1242 (2008). A trial court may award attorneys' fees, however, if the parties to a contract have an agreement to that effect. *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 445, 952 A.2d 275 (2008).

 Where an award of attorneys' fees is authorized by contract, "the trial court will examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable." *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.,* 380 Md. 285, 316, 844 A.2d 460 (2004). A trial court's determination of the reasonableness of attorneys' fees " 'is a factual determination within the sound discretion of the court, and will not be overturned unless clearly erroneous.' " *Royal Investment Group, LLC v. Wang,* 183 Md.App. 406, 457, 961 A.2d 665 (2008) (quoting *Myers v. Kayhoe,* 391 Md. 188, 207, 892 A.2d 520 (2006)), *cert. dismissed,* 409 Md. 413, 975 A.2d 875 (2009).

 A contractual fee award is assessed pursuant to the factors set forth in Rule 1.5 of the Maryland Lawyers' Rules of Professional Conduct. *Monmouth Meadows Homeowners Ass'n v. Hamilton,* 416 Md. 325, 336–37, 7 A.3d 1 (2010). Those factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*Id.* at 336–37 n. 10, 7 A.3d 1 (quoting Md. Lawyers' R. Prof'l Conduct 1.5(a)). *Accord Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md.App. 489, 499–501, 28 A.3d 75 (2011). The court need not "explicitly comment on or make findings with respect to each factor." *Monmouth*, 416 Md. at 337 n. 11, 7 A.3d 1. Indeed, it need not even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Id.* at 340 n. 13, 7 A.3d 1.

 Here, the trial court specifically stated that it was guided by Rule 1.5. The court discussed the results obtained, noting that much of the litigation involved assessing liability for environmental contamination costs, an issue on which WRIT did not prevail. Thus, the court limited the fees and expenses to those related to collecting holdover rent. And with respect to the fees in that regard, the court noted that the hourly rates were "high for Carroll County Attorneys." Considering the factors in Rule 1.5, the court found that "a fair and just award" for attorney's fees was $25,000.00. That finding was not clearly erroneous.

**JUDGMENT OF THE CIRCUIT COURT AWARDING WRIT HOLDOVER RENT REVERSED. JUDGMENT AWARDING ATTORNEYS' FEES AFFIRMED. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**