UNREPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 568


September Term, 2013

---

BOARD OF TRUSTEES,
COMMUNITY COLLEGE OF
BALTIMORE COUNTY

v.

PATIENT FIRST CORPORATION

---

Eyler, Deborah S.,
Graeff,
Moylan, Charles E., Jr.
  (Retired, Specially Assigned),

JJ.

---

Opinion by Graeff, J.

---

Filed: August 29, 2014

This case arises from an agreement between Patient First Corporation ("Patient First"), appellee, and the Board of Trustees of the Community College of Baltimore County ("CCBC"), appellant, pursuant to which Patient First allowed CCBC students to gain "supervised clinical experience" as phlebotomists at Patient First centers in the Baltimore area. The agreement contained an indemnification provision, which provided that CCBC would indemnify Patient First for any liability arising from negligent acts of CCBC students.

On January 13, 2007, a CCBC student phlebotomist at a Patient First clinic accidentally stuck herself with a needle and then drew blood from a child using the contaminated needle. As a result of the ensuing lawsuit by the child's family, Patient First was required to pay $10,000 to settle the case. Patient First sought to enforce the indemnification provision of the agreement to recover its payment, as well as the attorneys' fees incurred in defending the negligence action. The circuit court found that CCBC breached the agreement by failing to indemnify Patient First for its costs. It awarded $87,097.08, consisting of $10,000 paid toward the settlement of the lawsuit and the remainder toward attorneys' fees.

On appeal, CCBC presents two questions for our review, which we have rephrased slightly, as follows:

1.      Did the circuit court err in determining that the indemnification provision of the agreement required CCBC to indemnify Patient First for its defense of the negligence action?

2.      Did the circuit court abuse its discretion in allowing testimony regarding the reasonableness of Patient First's attorneys' fees, and in awarding attorneys' fees based on that testimony?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On September 12, 2003, CCBC and Patient First entered into an Agreement for Clinical Program - Venipuncture (the "Agreement"). Pursuant to the Agreement, Patient First would provide a "supervised clinical experience" for students in CCBC's venipuncture program, and CCBC would maintain "professional liability insurance that covers the Venipuncture Students and [CCBC] faculty in the Program in the amounts of $1,000,000 per occurrence and $3,000,000 in the aggregate." The Agreement, which was drafted by CCBC, also contained a section entitled "Indemnification," which provided, in pertinent part, as follows:

> 7.1 [CCBC] will defend, indemnify, and hold [Patient First] harmless from any and all losses, claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees) which arise out of the negligent acts or omissions of [CCBC], its agents, employees, or Venipuncture Students in connection with this Agreement. . . . The obligations of [CCBC] under this subparagraph 7.1 are subject to and limited by its liability under Section 5-301 et [s]eq. [a]nd 5-519, Courts and Judicial Proceedings, Annotated Code of Maryland, as amended.
>
> It is further understood and agreed that [CCBC] is not waiving or relinquishing in any manner any defenses that may be available to [CCBC] including, but not limited to, government sovereign immunity or breach of contract or otherwise, nor is [CCBC] relinquishing any defenses that may become available to it at any time during the term of this Agreement, but that [CCBC] is free to assert all defenses that may be available to it at law or in equity.

On January 13, 2007, Morgan Ebaugh, a CCBC student working as a student phlebotomist at a Patient First clinic pursuant to the Agreement, drew blood from a six-year-old patient, Dimitris Politis ("Dimitris"), after she first stuck herself with the needle she was using. Ms. Ebaugh subsequently tested positive for Hepatitis C. Dimitris was then tested for a year, but he did not test positive for Hepatitis C.

On December 14, 2009, Susan Politis, Dimitris' mother, filed suit, individually and as parent and next friend of Dimitris, against Patient First, Patient First's affiliates, and Ms. Ebaugh. The complaint asserted that Ms. Ebaugh "acted as an actual and/or apparent agent, servant and employee of" Patient First. It further asserted that the defendants, including both Patient First and Ms. Ebaugh, owed a duty of care, which included "the performance of a simple blood draw without injury and the protection of the Plaintiffs from contaminated needles." On March 16, 2011, the parties reached a settlement agreement, in which Patient First agreed to pay $10,000 toward the $50,000 agreed upon.

Pursuant to the Agreement, Patient First requested that CCBC indemnify it for Ms. Ebaugh's negligence and reimburse Patient First for the $10,000 in settlement funds, as well as its attorneys' fees in defending the lawsuit. CCBC refused Patient First's request for indemnification.

Patient First subsequently filed suit for breach of contract, alleging that CCBC's "failure to indemnify Patient First as required by Paragraph 7.1 of the Agreement constitutes

a breach of the Agreement."[1] Patient First sought $88,937.39 in damages, consisting of the $10,000 settlement payment and $78,937.39 in costs and attorneys' fees.

On August 25, 2011, CCBC filed its answer to Patient First's Amended Complaint, generally denying liability for breach of contract. Although CCBC admitted that the student was negligent, it asserted in its answer that "[t]he contract does not indemnify [Patient First] against its own negligence," and "[t]o construe the contract to indemnify [Patient First] for its own negligence would violate public policy."

On June 25, 2012, both parties filed motions seeking summary judgment. In its motion, CCBC argued that Patient First was "not entitled to indemnification for its own admitted negligence," asserting that Patient First was negligent in supervising Ms. Ebaugh at the time she performed the needle stick on Demitris. It contended that it would be "against public policy to uphold Patient First's breach of contract claim for indemnification for its own admitted negligence and the costs of defending itself from a claim based on that negligence."

Patient First argued that "the plain language of the Agreement require[d] CCBC to indemnify Patient First," noting that it was undisputed that Ms. Ebaugh was a Venipuncture

---

[1] Patient First's original Complaint was filed June 29, 2011. The Board of Trustees of the Community College of Baltimore County ("CCBC") filed a Motion to Dismiss, asserting, in pertinent part, that the complaint failed to state a claim against the Community College of Baltimore County because that was not an entity subject to suit. Accordingly, on August 19, 2011, Patient First filed its Amended Complaint naming the Board of Trustees of CCBC as the defendant.

Student under the Agreement, that she was negligent, and that Patient First incurred losses, costs, and expenses in defending the lawsuit that resulted from Ms. Ebaugh's negligence. It disagreed with CCBC's argument that it was not entitled to indemnification because of negligence in supervising Ms. Ebaugh, asserting that Paragraph 7.1 of the Agreement "does not except circumstances where Patient First is allegedly negligent."

On August 24, 2012, the court denied both motions, noting that, although it was undisputed that Ms. Ebaugh "performed a negligent act" while working as a student phlebotomist at Patient First, it was not "sufficiently clear as to whether there was negligence or not in supervision of [Ms.] Ebaugh at the time she was negligent in performing a vein puncture." The court concluded that, because there was "a dispute of material facts," and due to the "absence of specifics sufficient to allow [it] to conclude that either party is correct in its assertions," summary judgment was not proper.

On January 11, 2013, Patient First filed a motion in limine to "exclude any evidence or legal argument by [CCBC] that Patient First's claims are barred because of its own negligence." It asserted that CCBC "could not point to any facts that constituted Patient First's negligence other than its alleged failure to supervise [Ms.] Ebaugh – which was not required by the parties' Agreement." It argued that any negligence on its part was not relevant, and in any event, CCBC could not prove that it was negligent, asserting that expert testimony is required to establish negligence, and CCBC had "failed to identify any expert."

Patient First argued that, without expert testimony that it was negligent, CCBC should be excluded from introducing evidence or legal argument in that regard.[2]

Trial began on April 10, 2013. Melanie Mendoza, the Medical Director of the Patient First facility where Ms. Ebaugh performed the needle stick on Dimitris, ordered blood work to be performed on Dimitris during his visit on January 13, 2007.[3] She informed Ms. Politis that someone would come to draw the blood, and she left the room to see other patients. Dr. Mendoza's expectation was that a "lab person" who was a Patient First employee would come to the room and draw Dimitris' blood.

Because the results of the blood test were taking a while, Dr. Mendoza returned to the examination room to check with Ms. Politis regarding whether blood had been drawn. Ms. Politis informed Dr. Mendoza that, during the blood draw, the phlebotomist stuck herself with the needle she was attempting to use on Dimitris. Dr. Mendoza went to the lab, where she learned that Ms. Ebaugh was the person who attempted Dimitris' blood draw. Prior to visiting the lab, Dr. Mendoza was unaware that there was a student phlebotomist working that day.

When Dr. Mendoza asked what had happened during the blood draw, Ms. Ebaugh told her that she used a butterfly needle and "grazed herself" with the needle. She saw blood on the needle, so she threw it away and used a second needle to attempt once again to draw

_____

[2] The court reserved its ruling on the motion in limine.

[3] At the time of trial, Dr. Mendoza was the Medical Director of a different Patient First facility.

-6-

Dimitris' blood, but she was unsuccessful. Dr. Mendoza returned to the room and told Ms. Politis what she learned from Ms. Ebaugh. Ms. Politis told Dr. Mendoza that she only saw Ms. Ebaugh use one needle. Dr. Mendoza then checked the needle box in the examination room and found only one needle inside.

After Dr. Mendoza informed Ms. Ebaugh that she had observed only one needle in the needle box, Ms. Ebaugh admitted that she had used the same needle that she stuck herself with on Dimitris. At Dr. Mendoza's direction, Ms. Ebaugh obtained a blood test. She tested positive for Hepatitis C. Dr. Mendoza did not know whether Dimitris was tested for Hepatitis C.

On cross-examination, Dr. Mendoza agreed that performing a blood draw on a six-year-old child "is much more difficult than doing a blood draw on an adult," and it required experience. Dr. Mendoza felt confident when she ordered the blood draw that "whoever draws the blood knows what they are doing drawing the blood." It was her understanding that student phlebotomists working at Patient First were supervised by Patient First lab technicians when they performed blood draws, and "the lab techs and nurses and medical assistants are there to supervise them and help them." Dr. Mendoza testified that she was not responsible for supervising Ms. Ebaugh.[4]

---

[4] As CCBC notes in its brief to this Court, this response contradicts Patient First's responses to discovery, in which it indicated that, "[a]t the time of the Politis incident, [Ms.] Ebaugh was under the general supervision of Dr. Mendoza."

Lisa Baldwin, Director of Training for Patient First, signed the Agreement. She explained that, under the Agreement, Patient First did not agree to supervise or observe "each and every needle stick." With respect to supervision of CCBC students, Ms. Baldwin explained Patient First's policies and practices as follows:

> [W]hen we got a student from [CCBC], we would have the student observe the person that was working with them for phlebotomy sticks and then we would . . . observe the student while they performed the phlebotomy sticks. Once the student was deemed competent, then we would allow the student to then go and perform venipunctures and they were to come back to us if they had any issues, and they could go to the medical assistants, the nurses, lab.

Based on the indemnification provision of the Agreement contained in Paragraph 7.1, Ms. Baldwin understood that if a CCBC student "had any issues or caused any problems, that the school would be held responsible and deal with all of those issues."[5]

Stephen McCoy, Vice President and General Counsel for Patient First, testified that, after being served with the complaint filed by Ms. Politis in January 2010, Patient First retained counsel, Hancock, Daniel, Johnson, & Nagle, P.C. (the "Hancock Firm"), to defend it in the litigation. After the Politis litigation was resolved via settlement in January 2011, the firm sent Patient First a bill for $87,097.08, which included $10,000 for Patient First's portion of the settlement and $77,097.08 for attorneys' fees and costs. Mr. McCoy stated that

---

[5] Patient First offered into evidence CCBC's Response to its Request for Admissions, in which CCBC admitted that "Patient First had no contractual obligation to CCBC to personally observe CCBC Venipuncture students during each and every needle stick," and "[e]ach clinical site determines the necessary level of supervision, depending on the patient."

the amount Patient First was billed and paid was "slightly less" than the amount sought as damages in Patient First's complaint. Patient First paid the bill.

On cross-examination, Mr. McCoy agreed that the complaint in the Politis litigation alleged that Patient First was negligent in supervising Ms. Ebaugh. Accordingly, the settlement funds, attorneys' fees, and costs associated with the litigation were expended in order to defend against the allegation that Patient First's negligence caused Dimitris' damages. In the settlement agreement reached in the Politis litigation, Patient First did not admit liability and denied all allegations of negligence.

At the conclusion of Patient First's case, CCBC moved for judgment on the grounds alleged in its motion for summary judgment. The court denied CCBC's motion.

CCBC's first witness was Lane Miller, Coordinator of Allied Health for CCBC. As coordinator, Mr. Miller oversaw the phlebotomy program, and one of his duties included setting up clinical assignments for students. He was responsible for contacting local healthcare providers to inquire whether they would participate in a program providing clinical experience to CCBC phlebotomy students. He contacted Patient First regarding a potential partnership and met with Ms. Baldwin.

Before the Agreement was signed, Mr. Miller met with Ms. Baldwin twice, during which they discussed the type of supervision that would be provided to CCBC students. The first few days of the clinical externship, CCBC students would shadow Patient First staff, and then, once the student was accomplished and the site supervisor was confident with that

student, "the student would then begin to do their own blood draws with the direct supervision from Patient First." After the supervisor observed the student, "the student could then work independently."

Mr. Miller and Ms. Baldwin also discussed "hard sticks," which referred to blood draws for "any children under the age of ten, any elderly patient and any obese patient because it's typically harder to get a successful draw from those patients." Mr. Miller's understanding from his conversations with Ms. Baldwin was that CCBC students would not do a hard stick, or "if a decision was made that a hard stick was to be drawn by our [student], that they would have a direct supervisor over their shoulder in case there [were] any complications." This understanding was not put in writing.

Mr. Miller believed that the supervision arrangement he described at trial was what was meant by the term "supervised clinical experience" in Paragraph 1.1 of the Agreement. On cross-examination, he clarified that it was not his understanding that Patient First promised that a Patient First employee would observe "each and every needle stick."

Students participating in the CCBC program were required to work 80 hours and perform at least 100 successful needle sticks. Ms. Ebaugh was scheduled to work at Patient First Monday through Friday, from 5:00 p.m. to 10:00 p.m., and one weekend shift. At the time of the Politis incident, Ms. Ebaugh had completed 25-30 hours at Patient First. After the incident, Ms. Ebaugh sent an e-mail to Mr. Miller stating that she did not wish to

continue with the phlebotomy program. She did not respond to his requests that she come in and discuss the incident.

Michelle Jancewski, Director of Health and Human Services and Workforce Development at CCBC, supervised Mr. Miller when he was in charge of the phlebotomy program. With respect to CCBC's Agreement with Patient First, her understanding was that Patient First "would supervise the student so that the student and patient were safe," and that CCBC students would not perform difficult needle sticks. She understood that Patient First employees would supervise CCBC students performing ordinary needle sticks. She acknowledged, however, that CCBC admitted, in response to Patient First's request for admissions, that "Patient First had no contractual obligation to [CCBC] to personally observe the students during needle sticks." She also acknowledged that, during her deposition as a corporate designee of CCBC, she agreed that the Patient First clinical sites came up with their own guidelines for supervision, depending on the patient.

Charles Andrews, an adjunct faculty member at CCBC, testified that he taught phlebotomy courses at the college, and Ms. Ebaugh was one of his students. In his experience as a preceptor, he had never allowed a venipuncture student to do a blood draw on a six-year-old child.

Melissa Hopp, CCBC's Vice President of Administrative Services, testified that, pursuant to the Agreement, CCBC obtained professional liability insurance for its students

participating in the program. After the Politis lawsuit was filed, CCBC notified the insurer, and the "[i]nsurance kicked in to defend [Ms.] Ebaugh."

As a result of the lawsuit, Ms. Hopp received a letter from Patient First asking CCBC to indemnify it for its costs in defending the lawsuit. Ms. Hopp spoke with Patient First's counsel, and she advised that they would not indemnify Patient First. She explained that indemnification was not required because "we judged that they were negligent" in their supervision of Ms. Ebaugh, "and they were asking us to pay for their negligence." It was her understanding that, pursuant to the Agreement, Patient First was to "supervise [CCBC] students, to observe and instruct them and to prevent those students from committing errors or . . . from being unsafe."

At the conclusion of CCBC's case, counsel for CCBC read into evidence Patient First's answer to a question in CCBC's first set of interrogatories, in which CCBC asked if Ms. Ebaugh was under supervision by any agent, servant, or employee of Patient First Corporation at the time of the incident alleged in the lawsuit filed by Susan Politis. Patient First responded: "At the time of the Politis incident, [Ms.] Ebaugh was under the general supervision of Dr. Mendoza."

Prior to issuing its ruling, the court heard closing argument from the parties. Patient First argued that the indemnification provision in Paragraph 7.1 clearly applied because the Politis lawsuit against Patient First was based on Ms. Ebaugh's negligence. With respect to CCBC's argument that Patient First was negligent in supervising Ms. Ebaugh, it argued that

-12-

there was "no sufficient allegation in the Politis Complaint that stands alone as a negligence claim against Patient First independent of [Ms.] Ebaugh's actions in sticking the child with the same needle." Patient First contended that, without expert testimony establishing its negligence, there was no basis on which the court could determine that Patient First was prohibited from enforcing the indemnification provision due to its own negligence.

CCBC argued that, pursuant to Paragraph 7.1 of the Agreement, which provided that CCBC was not waiving any defenses to Patient First's claim for indemnification, it could successfully defend against Patient First's claim based on Patient First's own negligence in supervising Ms. Ebaugh. Specifically, it asserted that it was "black letter law" that a party was not required to indemnify another party for its own negligence. CCBC contended that the Politis complaint was based on Patient First's own negligence, as well as Ms. Ebaugh's, and if Patient First had employed the proper supervision, "we wouldn't be standing here today because [Ms.] Ebaugh would not have been allowed to do the draw." CCBC asserted that the testimony of Dr. Mendoza, the person responsible for supervising Ms. Ebaugh, that she was unaware that a student phlebotomist was in the building, "ends the case right there."

The court ruled in favor of Patient First, explaining its ruling as follows:

When you look at this cause of action, the broadest reading of the Complaint that was filed, alleges very clearly negligence on the part of the student and nobody disputes that, and it alleges liability on the part of Patient First for respondeat superior because the student was their actual or apparent agent and I think that still would fall within the indemnification . . . . But the indemnification piece really depends on . . . where the liability rests. It's not just what was alleged but what's the basis for liability. . . . So it comes down

-13-

to me whether there was adequate proof in this case that there was an independent breach of, you know, a duty by Patient First.

With respect to CCBC's argument that "there was a failure to supervise and clearly that's what caused this," the court stated:

[T]his Agreement was very non-specific about what the supervised clinic was supposed to be, and everybody who looked at it after the fact had a slightly different view of what supervised meant, including the people who were operating in the clinic at times, but there was no meeting of the minds or understanding of what the supervision obligation is for venipuncture students in a Patient First clinic.

The court agreed with Patient First that, to determine whether Patient First breached the appropriate standard of care, "some expertise" was required because it was not "apparent on [the] face" of the Agreement. Because the court did not "know what the standard is," it could not "independently determine whether Patient First breached it," and "[t]hat leaves me with liability being established based upon the breach by [Ms.] Ebaugh herself but a question mark as to whether the evidence is sufficient to show a breach by Patient First." The court concluded: "For that reason, all I'm left with is something that clearly falls under the Indemnification Provision in this contract." Accordingly, it awarded Patient First "the $87,097.08[,] which was the $10,000 paid in settlement plus the attorney's fees in the third party action."

On April 30, 2013, the court filed a written order reflecting its oral ruling. This timely appeal followed.

-14-

**STANDARD OF REVIEW**

We review a bench trial "on both the law and the evidence," and we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). "'A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it.'" *Hillsmere Shores Improvement Ass'n, Inc. v. Singleton*, 182 Md. App. 667, 690 (2008) (quoting *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 576 (2007)). "When the ruling of a trial court requires the interpretation and application of Maryland case law," however, "we give no deference to its conclusions of law." *Elderkin v. Carroll*, 403 Md. 343, 353 (2008). As the Court of Appeals has explained, "[t]he interpretation of a written contract is a legal question subject to *de novo* review by the appellate courts." *Calomiris v. Woods*, 353 Md. 425, 447 (1999).

**DISCUSSION**

**I.**

**Indemnification Provision**

CCBC contends that "the circuit court erred as a matter of law in awarding Patient First indemnification damages," asserting that a party can recover contractual indemnity for its legally culpable conduct only if the contract contains clear and unequivocal language indemnifying the party for its own negligence, which the Agreement here did not do. It argues that the circuit court erroneously put the burden of showing Patient First's negligence

-15-

on CCBC, asserting that Patient First had the burden to show that CCBC had a contractual obligation to indemnify it for its own loss.

Patient First acknowledges that, in the absence of unequivocal language, there generally is a presumption against indemnification for a service provider's own negligence. It contends, however, that the circuit court properly ruled in its favor for two reasons. First, it argues that, before reaching the issue of whether the presumption against indemnification applied, CCBC had to prove that Patient First was negligent, which it failed to do in the absence of expert testimony regarding the standard of care. Second, it argues that, even if CCBC did prove that Patient First was negligent, based solely on the allegations in the Politis Lawsuit, the presumption against indemnification for a party's own negligence is inapplicable here because there was no evidence that CCBC "was the type of unwary or uninformed Indemnitor that the presumption was designed to protect," and the language used in the Agreement was sufficient to show that it applied to the provider's own negligence.

Initially, we note that CCBC does not dispute that Ms. Ebaugh was negligent, and under the plain language of the Agreement, CCBC would be required to indemnify Patient First for Ms. Ebaugh's negligence. CCBC contends, however, that there is an exception to this requirement, relying on its assertion that Patient First was negligent in its supervision of Ms. Ebaugh and the general rule that "'contracts will not be construed to indemnify a person against his own negligence unless an intention so to do is expressed in those very words or in other unequivocal terms.'" *Kreter v. Healthstar Communications, Inc.*, 172 Md. App. 243,

254 (2007) (quoting *Crockett v. Crothers*, 264 Md. 222, 227 (1972)). *Accord Heat & Power*

*Corp. v. Air Products & Chemicals, Inc.*, 320 Md. 584, 593 (1990) (where "contract did not

expressly or unequivocally indemnify [the plaintiff] against its own negligence, the circuit

court judge was correct in ruling as a matter of law that [the defendant] had no contractual

duty to indemnify [the plaintiff]").

    The contract here did not contain express language that CCBC would indemnify

Patient First for its own negligence.[6]  Before CCBC can rely on the presumption against

indemnification for the indemnitee's own negligence, however, there must be a determination

---

[6] As indicated, the indemnification provision at issue provides as follows:

7.1     [*CCBC*] *will defend, indemnify, and hold* [*Patient First*] *harmless from any and all losses, claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees) which arise out of the negligent acts or omissions of* [*CCBC*]*, its agents, employees, or Venipuncture Students in connection with this Agreement.* . . . The obligations of [CCBC] under this subparagraph 7.1 are subject to and limited by its liability under Section 5-301 et [s]eq. [a]nd 5-519, Courts and Judicial Proceedings, Annotated Code of Maryland, as amended.

     It is further understood and agreed that [CCBC] is not waiving or relinquishing in any manner any defenses that may be available to [CCBC] including, but not limited to, government sovereign immunity or breach of contract or otherwise, nor is [CCBC] relinquishing any defenses that may become available to it at any time during the term of this Agreement, but that [CCBC] is free to assert all defenses that may be available to it at law or in equity.

(Emphasis added).

whether Patient First was negligent. In determining this question, a critical issue is who had the burden to prove the negligence or lack of negligence of Patient First.

Although there does not appear to be a Maryland case directly on point, other courts have addressed the issue and held that, where an indemnitor seeks to deny payment on the ground that the indemnitee was negligent, that is an affirmative defense that the indemnitor must prove. *See Norddeutscher Lloyd v. Jones Stevedoring Co.*, 490 F.2d 648, 649 (9th Cir. 1973) (indemnitor bore burden of proof of establishing that indemnitee's negligence precluded its recovery under indemnification agreement); *Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C.*, 138 P.3d 1210, 1215 (Ariz. Ct. App. 2006) ("[Indemnitor's] contention that [indemnitee] was grossly negligent is in the nature of an affirmative defense," and "[t]he proponent of an affirmative defense has the burden of pleading and proving it."); *N. Little Rock Elec. Co. v. Pickens-Bond Const. Co.*, 485 S.W.2d 197, 199 (Ark. 1972) (where indemnitor asserted "the affirmative defense that [the indemnittee] was guilty of negligence," the court noted the absence of "satisfactory authority which would place the burden on [the indemnittee] to establish that they were free of negligence"); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 126 (Tex. App. 2002) ("A claim that a contractual exclusion precludes indemnity is an affirmative defense.").

We agree with this analysis. We hold that an indemnitor who seeks to avoid payment under an indemnity agreement, based on the presumption against indemnification for a party's own negligence, has the burden to prove the indemnitee's negligence. Accordingly,

-18-

the circuit court properly focused on whether CCBC established that Patient First was negligent.

In finding that CCBC failed to show that Patient First was negligent, the court found that there was not a meeting of the minds between the parties regarding the supervision requirement. It stated:

> CCBC's argument . . . is that there was a failure to supervise. . . . and for me to then figure out what is the standard of care in that context and whether it was breached . . . requires something other than individual people's opinions on what it should be[.] [I]t required some expertise because it's not something that's apparent on its face. . . . I don't know what the standard is and, therefore, I can't independently determine whether Patient First breached it.

We agree with the circuit court's analysis. Expert testimony generally is required to establish a professional standard of care for a negligence claim, unless the negligence is obviously proven. *Schultz v. Bank of America N.A.*, 413 Md. 15, 19 (2010). The party alleging negligence "'bears the burden of overcoming the presumption that due skill and care were used.'" *Id.* at 29 (quoting *Crockett v. Crothers*, 264 Md. 222, 224 (1972)).

We are not persuaded by CCBC's argument that the allegations in the Politis lawsuit that Patient First was negligent were sufficient to meet CCBC's burden of proof. *See Tesoro Petroleum Corp.*, 106 S.W.3d at 125 ("Facts . . . not allegations, determine an indemnitor's duty to indemnify. The duty to defend  may be triggered by the pleadings, but the duty to indemnify is based on the jury's findings."). Without a jury finding that  Patient First was

negligent, or any other evidence of Patient First's negligence, the circuit court properly found that CCBC was required to indemnify Patient First.[7]

## II.

## Damages

CCBC next argues that the circuit court abused its discretion in allowing Mr. McCoy, Patient First's General Counsel, "to testify about the reasonableness of the Hancock firm's fees, and it clearly erred in awarding $77,097.08 in attorneys' fees based on that deficient testimony." In support, it argues that Mr. McCoy was not identified, or qualified, as an expert, but the court allowed him to "express an opinion as to whether the bill [was] reasonable." It asserts that Mr. McCoy's "scant and conclusory opinion testimony" was insufficient to prove that Patient First was entitled to attorneys' fees where there was no testimony regarding the reasonableness of the rates charged or the work done.

Patient First argues that Mr. McCoy "was competent to testify to the reasonableness of the Hancock fees," and "the trial court did not err in awarding such fees." It contends that it "produced sufficient testimony and documentation" on which the circuit court "could rely to evaluate the reasonableness of the Hancock fees."

---

[7] As indicated, the case settled and Patient First denied all allegations of negligence.

## A.

## Proceedings Below

During Mr. McCoy's direct examination regarding the bill Patient First paid to the Hancock firm, counsel for Patient First asked him whether "a total invoice of $77,000 [was] reasonable" in his "opinion as general counsel of Patient First." Counsel for CCBC objected on the following grounds: (1) "Mr. McCoy was never identified as an expert witness previously"; and (2) Mr. McCoy could not testify that the fee he paid in litigation in which he was a plaintiff was reasonable. With respect to the second ground, the court stated that there was "nothing about the fact that he's a plaintiff that . . . precludes him from testifying to the fairness and reasonableness of the bill."

Counsel for Patient First argued that it did not need to admit Mr. McCoy as an expert, asserting that, in order to prove damages, it only needed to "establish that the amounts were invoiced and . . . paid," and it was in the court's discretion to determine whether those amounts were reasonable. The court noted that it could not make such a determination absent testimony, but that, "as the general counsel, [Mr. McCoy] can express an opinion as to whether the bill was reasonable." The court overruled CCBC's objection.

Mr. McCoy then testified that, in his experience with Patient First, the bill represented "a reasonable and customary amount for a lawsuit that proceeds through depositions, a mediation and to a settlement." An itemized list of the Hancock firm's fees was admitted as an exhibit during trial.

-21-

At the conclusion of trial, both parties presented arguments regarding the damage award. The court noted that Patient First's burden was to prove "not just that a fee was incurred but the fairness and reasonableness."

**B.**

**Attorneys' Fee Portion of Damage Award**

The indemnification language contained in Paragraph 7.1 of the Agreement expressly provided that CCBC "will defend, indemnify, and hold [Patient First] harmless from any and all losses, claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees)" for claims that arise out of the negligence of a CCBC student. Accordingly, the plain language of the Agreement provided that Patient First was entitled to indemnification for its attorneys' fees.

"When an award of attorneys' fees is 'based on a contractual right, the losing party is "entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages."'" *B & P Enterprises*, 133 Md. App. 583, 624 (1999) (citations omitted). The party seeking fees "bears the burden 'to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Id*. (quoting *Maxima Corp. v. 6933 Arlington Dev. Ltd. P'ship*, 100 Md. App. 441, 454 (1994)). A circuit court's determination regarding the reasonableness of attorneys' fees "'is a factual determination within the sound discretion of the court, and will not be overturned unless clearly erroneous.'" *Carroll Indep. Fuel Co. v. Washington Real Estate*

*Inv. Trust*, 202 Md. App. 206, 239 (2011) (quoting *Royal Investment Group, LLC v. Wang*, 183 Md. App. 406, 457 (2008)).

As indicated, detailed billing statements from the Hancock firm were admitted into evidence, providing a breakdown of the charges incurred in responding to the Politis lawsuit. The itemization included the date, the amount of time, the attorney, the attorney's rate, and description of the task for each task completed in connection with the Politis Lawsuit. Mr. McCoy testified that, in his experience as General Counsel for Patient First, the fees charged were reasonable. This evidence was sufficient to establish the reasonableness of the fees. *See Zachair Ltd. v. Driggs*, 135 Md. App. 403, 438-39 (2000) (attorney may offer lay opinion on the reasonableness of fees), *cert. denied*, 363 Md. 206 (2001). *Accord Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co. of Ohio, Inc.*, 848 P.2d 1079, 1083-84 (1993) (General Counsel qualified to testify with respect to the reasonableness of attorneys' fees).

We perceive no abuse of discretion in the circuit court's finding that Patient First's attorneys' fees were reasonable. The court did not err in awarding these fees as damages against CCBC.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**